# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, JASON MARRERO, being duly sworn, depose and state the following:

1. I am a Special Agent with the Office of Inspector General, United States Department of Health and Human Services ("HHS"). I have been so employed for approximately eight years. I am currently assigned to the Columbia, Maryland Field Office. My primary duty as a Special Agent is the investigation of violations of the criminal laws of the United States relating to health care fraud. As a Special Agent, I have participated in the preparation and execution of numerous search warrants at medical offices and residences.

2. My knowledge of the facts and circumstances contained within this affidavit is based, in part, on my personal participation in the investigation, reports and information provided to me by other law enforcement officers, private health care fraud investigators, practicing ophthalmologists, and my experience and background as a Special Agent of the HHS. This affidavit does not contain all the information I know about this case, but is simply for the purpose of establishing probable cause for this application.

3. HHS, the Federal Bureau of Investigation ("FBI") and the Office of Inspector General for the Office of Personnel Management ("OPM") have been conducting an investigation into alleged violations of federal criminal laws by an ophthalmologist who maintains medical offices in Washington, D.C. and Annandale, Virginia. In particular, the HHS, FBI and OPM have been investigating whethe         submitted fraudulent information to Aetna, one of the health care benefit programs for which          was a participating provider, in response to a claim audit, in violation of Title 18, United States Code, Section 1347.

1

4. Title 18, United States Code, Section 1347 makes it an offense for any person to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program. Title 18, United States Code, Section 24 defines the term "health care benefit program" as "any public or private plan or contract, affecting commerce under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." According to marketing information provided by Aetna, it is one of the nation's leading providers of health care, dental, pharmacy, group life, disability and long-term care insurance serving more than 14 million medical members as of February 8, 2006.

5. This affidavit is submitted in support of the application for warrants to search medical office, located at 3301 New Mexico Avenue, N.W., Suite 214, Washington D.C. 20016 and his residence, located at 4617 Kenmore Drive, N.W., Washington, D.C. 20007 to seize the original files for 22 Aetna patients listed below. The original files are needed to determine whether       and/or others fabricated these files prior to submitting them to Aetna in support of procedures previously billed. Forensic analysis may possibly confirm that these alterations were made several years after the date       claimed to have provided those services. Furthermore, the Aetna patient's complete medical records are needed to conduct a comparison of the records submitted to Aetna with records of other visits to       by the same patient.

6. On June 30, 1997,       agreed, as a participating provider, to produce medical records upon Aetna's request for "peer, quality and utilization review purposes." In November 2000, Pioneer EyeCare ("PEC") attempted to conduct an on-site audit at       Washington D.C. medical office on behalf of Aetna.       office manager and wife would not provide

2

PEC's utilization review nurse with the requested files. When the four patient files were eventually produced one month later, PEC found that         consistently over billed for the following procedures: Serial Tonometry, Fundus Photography and the level of office visits. PEC estimated that      had been overpaid $4,200. PEC offered to settle the claim for $4,200. If       refused to pay the $4,200, PEC notified him that it would conduct a comprehensive audit of a larger number of files.      settled.

    7. On December 30, 2002, Aetna instituted its own audit of       . By letter, Aetna requested that       produce photocopied medical records for the following ten subscribers for the specified dates of service ("DOS"):

    R.H. ID#000003890; DOS:11/12/01
    S.L. ID#009668294; DOS: 1/21/02
    N.D. ID#286483216; DOS: 2/22/01
    P.P. ID#BBDYBD0A; DOS: 10/12/01 - 1/18/02
    L.W. ID# 242259175; DOS: 3/17/00-11/9/01
    G.B. #ID 039222128; DOS: 5/25/01
    J.C. ID# 039222128; DOS: 11/9/01
    E.L. ID#BBBLWYWA; DOS: 9/10/01-1/10/02
    D.S. ID#040343259; DOS: 1/10/00-9/18/00

      did not respond. On January 30, 2003, Aetna again requested these same records. According to Aetna,      production was slow and was not completed until June 26, 2003. Aetna concluded based upon a limited review of these records that       had over-billed the level of office visits for some of these patients.

    8. On September 10, 2003, Aetna requested additional medical records for the following twelve subscribers:

    B.M. ID #159401323; DOS: 6/14/01
    J.L. ID#021300183, DOS:5/2/03
    R.M. ID#244788486, DOS: 10/8/02

A.L. ID#640163308, DOS: 5/7/01
Z.F. ID#231594225, DOS:5/30/02
E.D. ID#577660283, DOS: 3/20/02
B.K. ID#013427977, DOS: 6/16/03
G.S. ID#137265431, DOS: 10/27/00
N.N. ID#578867936, DOS: 2/11/02
D.R. ID#156646113, DOS:11/30/01
A.B. ID# 528411703, DOS:4/10/02
N.M. ID#141320981, DOS: 3/22/01

Again,       was slow to comply. Aetna resent its request on February 24, 2004. To date,       has failed to produce four of the twenty-two files requested.

9. On February 16, 2005, the United States Attorney's Office for the District of Columbia served       with a subpoena duces tecum, seeking the production of, among other things, the medical records of 121 patients. Through his attorney,       provided these records on March 21, 2005. The medical records of eight patients were subsequently reviewed by a consultant and practicing ophthalmologist in the Greater Washington, D.C. Metropolitan area. He found that       medical records from 1999 through March 2002 did not properly document most of the procedures billed.

10. On February 2, 2006, Aetna provided the United States Attorney's Office with the records it received from       in response to the December 2002 audit. Your affiant compared these patient records with those reviewed by the consultant. On their face, the latter records appear substantially different. Specifically, your affiant reviewed the medical records of J.S, B.M, and J.C. that       provided to Aetna with the medical records of I.M., S.G. and W.A. that were produced to the U.S. Attorney's Office and reviewed by the consultant.

11. According to       records, J.S and I.M. were treated by       on the same day - April 7, 2000. The billing records reflect that       provided seven services to J.S. and nine to

4

I.M. Four of these services were the same: Gonioscopy, Serial Tonometry, Indirect Ophthalmoscopy, and Provocative Glaucoma Test. Even though         billed more procedures for I.M., J.S.'s medical records contained more notes and drawings.

12.   Your affiant also compared the medical records submitted to Aetna for B.M.'s June 14, 2000 appointment with the records of S.G.'s June 15, 2000 appointment reviewed by the consultant.         similarly billed the following five procedures for B.M. and S.G.: Indirect Ophthalmoscopy, Provocative Glaucoma Test, Visual Field, Fundus Photography, and External Ocular Photography. Your affiant found that B.M.'s medical records contain many more notes than S.G.'s

13.   Finally, your affiant compared J.C.'s medical records from November 9, 2001 with W.A.'s medical records for a November 2, 2001 appointment.         billed for performing six procedures on each patient, four of which were the same: Gonioscopy, Visual Field Test, Indirect Ophthalmoscopy, and Fundus Photography. Despite the similarity of the procedures performed on both these patients, the amount of documentation in J.C.'s medical records are substantially greater than D.T.'s.

14.   On February 6, 2006, one of         ; employees (Employee #1), who has worked for him for more than twenty years, confirmed that         had instructed her and other employees to delay complying with Aetna's 2002/2003 audit requests. Employee #1 identified         as the author of the following note relating to the Aetna audit:

> I will send out two of the 12 little indians every 3 weeks, 6 times 3 is 18 weeks, or 4 months, which is into Feb 2004
> Here is the approach for Andy Dandy: January 28, 2004
>
> Objective: 1) To continue to do things slow 2) to find out what they are looking

5

for 3) maybe to have them reassure us that this problem will be small to nothing. (Remember, we sent out 10 of 10 charts in Spring of 2003, and 8 of the next 12 in the Fall of 2003. The last mailing was December 16. There are 4 'left.' They have 20 charts now.

Theme: Joy is out sick most of this month, we are really backed up . . What is this about now?

Employee #1 further confirmed that           's wife, the office manager, had handwritten "say slow" above the reference to being backed up.

15.  Employee #1 explained to your affiant that she regularly pulls 10-15 patient files in preparation for their scheduled appointments. These files are maintained in the reception area. She estimated that this task takes less than 15 minutes.

16.  This employee further identified another one of         's employees (Employee #2) as the author of numerous notes relating to Aetna patients included in the 2002/2003 audit. For example, Employee #2 wrote the following with regard to Aetna patient J.S.:

5/15/00
need on initial all documents, need better documentation for Gonioscopy 92020, need report & interpretation for Tonometry 92100. OV is eye code 92014.

4/7/00
need initial all documents, need better documentation for Gonioscopy 92020, need report & interpretation for 76516 ophthalmic biometry, 92082 visual field, 92100 tonometry, 92140 provocative test, 92225 Indirect Ophthalmoscopy, ov is e/m 99205. Per chart audit form, we over billed level of ov. We should have level due to incomplete history of patient.

(Emphasis in original). Employee #1 told your affiant that Employee #2, as part of her duties, regularly reviews         documentation to inform him whether the documentation is sufficient to meet insurance standards. According to Employee #1, Employee #2 did not begin this process until the middle of 2002. Employee #1 could not explain to your affiant why Employee #2

6

would have reviewed J.S.'s medical records for services billed in 2000.

17. Employee #1 also could not explain why Employee #2 wrote the following about Aetna patient J.C.'s November 9, 2001 appointment:

1. initialized ALL pages with a date of (same as DOS) including
2. need report & interpretation for fungus photography (92250)
3. need report & interpretation for visual field (92082)
4. need better drawing for indirect ophalmascopy (92225)
   Need report & interpretation for indirect ophalmascopy
5. need better documentation with gonioscopy (92020)
6. Ophthalmic biometry also require report & interpretation (A scan 76516)
7. OV code is E/M - needs 25 modifier (99205)
    base from American Academy of Ophthalmology E/M chart audit form:
    We over bill E/M code 99205. Should be lower lever because we never got complete history.

(Emphasis in original).

18. Based on a comparison of the records provided to Aetna in response to its audit and other patient records from that same time period, and Employee #2's instructions to       on how to document the medical records for procedures he had billed years previously, there is probable cause to believe that        knowingly and willfully sought to defraud Aetna in connection with payments       had previously received from Aetna.

19. On February 6, 2006, Employee #1 confirmed that the original patient files are currently maintained in either his Washington, D.C. office or residence. Current patient files remain in       office. Former patient files, however, have been archived and stored in       residence.

20. Based upon the facts set forth above, I believe there is probable cause to believe that       medical office located at 3301 New Mexico Avenue, N.W., Suite 214, Washington, D.C. 20016 and his residence located at 4617 Kenmore Drive, N.W., Washington, D.C. 20007

7

contain fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1347, and that the original patient files listed in Schedule A are fruits, evidence and instrumentalities of this violation.

The statements above are true and accurate to the best of my knowledge and belief.

_____
Jason Marrero
Special Agent, HHS

Sworn and subscribed before me
This _____ day of February, 2006.


_____
United States Magistrate Judge

**ALAN KAY**
**U.S. MAGISTRATE JUDGE**

# SCHEDULE A

## DESCRIPTION OF ITEMS TO BE SEIZED

The following items are to be seized:

A.B. ID# 528411703
A.L. ID#640163308
B.K. ID#013427977
B.M. ID #159401323
D.R. ID#156646113
D.S. ID#040343259
E.D. ID#577660283
E.L. ID#BBBLWYWA
G.B. #ID 039222128
G.S. ID#137265431
J.C. ID# 039222128
J.L. ID#021300183
L.W. ID# 242259175
N.D. ID#286483216
N.N. ID#578867936
P.P. ID#BBDYBD0A
R.H. ID#000003890
R.M. ID#244788486
S.L. ID#009668294
Z.F. ID#231594225

## SCHEDULE B
## DESCRIPTION OF PREMISES TO BE SEARCHED

<u>3301 New Mexico Avenue, N.W., Suite 214, Washington D.C. 20016</u>

3301 New Mexico Avenue, N.W. is a three story professional office building. The first level (mall level) of the building consists of various shops, restaurants and businesses. After arriving on the second floor from the elevators on the mall level, Suite 214 is at the end of the hallway to the right of the elevators. Double, dark brown wooden doors lead to Suite 214. A brown sign with white lettering to the left of the doors reads "                                                                                      ." There is a peep hole and a mail slot on the left-most door to Suite 214.

<u>4617 Kenmore Drive, N.W., Washington, D.C. 20007</u>

4617 Kenmore Drive, N.W. is a two-story brick single family home with a white front door and black railings on the second floor front balcony. Windows on the front and right side of the residence have gray storm shutters and the roof is covered with gray shingles. The number "4617" appears above the front door.